**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

**JOSEPH WELLS,**

      **Plaintiff,**

**v.**                                    **Case No.: 8:05-CV-2193-T-EAJ**

**XPEDX, a Division of International Paper
Co., a foreign corporation authorized
to do business in Florida,**

      **Defendant.**
_____/

## ORDER

Before the court are Defendant **Xpedx's Motion for Summary Judgment** (Dkt. 36), Plaintiff's **Response to Motion for Summary Judgment** (Dkt. 48), Defendant **Xpedx's Corrected Reply to Plaintiff's Response to Motion for Summary Judgment** (Dkt. 60),[1] Defendant's **Notice of Supplemental Authority** (Dkt. 53), Plaintiff's **Notice of Supplemental Authority** (Dkt. 55), Plaintiff's **Motion to Strike** (Dkt. 49), Defendant's **Motion to Strike Unauthenticated Exhibits** (Dkt. 50), Defendant's **Response to Plaintiff's Motion to Strike** (Dkt. 51), and Plaintiff's **Response to Motion to Strike Exhibits** (Dkt. 56).

Plaintiff Joseph Wells brought suit against his former employer Xpedx, a division of International Paper Corporation, under the Age Discrimination in Employment Act ("ADEA"), 29

_____

[1] Defendant requested leave to file a reply brief to Plaintiff's response which was granted on August 9, 2006 (Dkt. 57). In its reply, Defendant includes the affidavit of Lama Alrawas, which was not previously included in Defendant's motion for summary judgment. Defendant did not request, nor did the court permit Defendant to file any supplemental affidavits with its reply. However, because Plaintiff has filed no objections to the additional affidavit even though he has had ample time to do so, the court will consider the evidence in ruling on the instant motion.

U.S.C. § 621, et. seq., the Florida Civil Rights Act, Fla. Stat. § 760.01, et. seq., the Federal Whistleblower Act, 42 U.S.C. § 2000e-3, and the Florida Whistleblower Act, Fla. Stat. § 448.102(3). Plaintiff alleges that he suffered damages as a result of a wrongful termination of employment on the basis of age and/or that he was terminated in retaliation for alleged complaints he made about age discrimination. Plaintiff also asserts a claim against Defendant for the intentional infliction of emotional distress.

Defendant contends that in connection with his termination, Plaintiff executed an agreement that included a release of claims against Defendant (Dkt. 5, at 16). Plaintiff does not dispute that he signed a release but contends that the release is invalid (see Dkt. 2, ¶¶ 116-117, 126, 137).

The court found the validity of Plaintiff's release to be a potentially dispositive, threshold issue and bifurcated discovery; initial discovery was limited to the release of claims issue (Dkt. 23). Defendant now seeks summary judgment on the grounds that the release is valid and therefore bars Plaintiff's entire action. In response, Plaintiff maintains that the signed release which waived his rights to bring age discrimination claims against his former employer was ineffective as a matter of law.

## I.    Factual Background

Defendant Xpedx acquired three companies between 1998 and 2000: Ailing & Cory, Zellerbach, and Nationwide Papers (Dkt. 37, Attach. 10, Wilson Aff. ¶ 2).[2] In 2001, Xpedx implemented a reduction in force ("RIF") and eliminated over 3,000 positions through both attrition and terminations. (Id.) The company cited overstaffing due to the acquisitions and integration that

---

[2] As discussed infra, the court denies Plaintiff's motion to strike paragraph 3 of the Wilson affidavit and paragraph 7 of the Watkoske affidavit. Consequently, the discussion of the factual background relies on the Wilson and Watkoske affidavits in their entirety.

occurred between 1998 and 2000 as the reason behind the RIF. (Id.) Xpedx offered a severance plan in which an affected employee would receive a severance in exchange for a waiver of any potential employment-based claims the employee would have against the company. (Id.) A large part of the RIF was completed by December 2001. (Id.)

Plaintiff began working for Defendant when it acquired Plaintiff's previous employer, Zellerbach. Plaintiff's position with Zellerbach at the time of the acquisition was Director of National Accounts. (Dkt. 37, Attach. 2, Wells Dep. 9:2-23, May 12, 2006) After the acquisition, Plaintiff remained in this same position with Xpedx for approximately three years. (Id.) Plaintiff then held the job of General Sales Manager of National Accounts for "a year and a couple of months." (Id.) During Plaintiff's tenure with Xpedx, he reported to the Vice President of National Accounts. (Id. at 30:10-31:19) For approximately 15-17 months prior to Plaintiff's termination, the Vice President of National Accounts to whom Plaintiff reported was Daniel Watkoske ("Watkoske"). (Id. at 31:7-17)

Sometime during March 2002, Plaintiff met with Watkoske and Jack Luker, Vice President of Sales ("Luker"). (Dkt. 37, Attach. 9, Watkoske Aff. ¶¶ 2-3; Dkt 41, Wells Aff. ¶¶ 2-4) Although the parties disagree as to the purpose and content of this meeting, it appears that Plaintiff's future with the company was discussed in some fashion. (Id.) At some point between April and July 2002, Plaintiff was promoted to the position of National Accounts Director of Sales–Retail. (Dkt. 43, Ex. M; Watkoske Aff. ¶ 3; Wells Dep. 9:2-7) The National Accounts Director of Sales–Retail position was a position created as a result of Watkoske and Luker changing the structure of the National Accounts Retail Group. (Watkoske Aff. ¶ 3)

In his prior job as General Sales Manager of National Accounts for Xpedx, Plaintiff was

responsible for the direct supervision of three national account managers, an operations manager, administrative assistant, and special projects manager, as well as sales responsibility. (Wells Dep. 13:20-15:15) After Plaintiff's promotion, he hired Matthew Morrow ("Morrow") as Sales Manager for National Retail on June 12, 2002, and was responsible for his direct supervision. (Watkoske Aff. ¶ 4) Plaintiff was also responsible for the supervision of his administrative assistant, Kathy Andrews, although the parties do not agree as to whether she was reporting directly to Plaintiff at the time of his termination. (Id. at ¶ 5; Wells Dep. 17:5-12, 32:1-5) Sometime during November 2002, Morrow was assigned to report directly to Watkoske. (Watkoske Aff. ¶ 5)

Plaintiff held the position of National Accounts Director of Sales–Retail until December 6, 2002, when Xpedx terminated him (Dkt. 37, Attach. 5). Watkoske and Andre Green, a human resources manager, met with Plaintiff on December 6, 2002 to notify Plaintiff of the decision to eliminate his position effective immediately. (Wells Dep. 32:18-33:10; Watkoske Aff. ¶ 7) In this meeting, Watkoske provided Plaintiff with a packet of documents to review which included a termination agreement. (Wells Dep. 32:18-36:5) The termination agreement included an offer of severance pay in exchange for a release of claims against Xpedx (Dkt. 37, Attach. 6).

Plaintiff had 45 days in which to consider the termination agreement. He was advised in writing to seek the advice of legal counsel and had seven (7) days after signing the agreement in which he could change his mind and revoke the agreement. (Id.; Dkt. 37, Attach. 5, at 1) On January 14, 2003, Plaintiff signed the release waiving his rights to bring suit against Xpedx in exchange for a severance package (Dkt. 37, Attach. 6, at 5). On January 14, 2003, Plaintiff also executed a separate bonus agreement which entitled him to a bonus in excess of his 2002 target amount in exchange for an agreement not to disparate, defame, slander, or otherwise denigrate Defendant (Dkt.

4

37, Attach. 8).

On November 24, 2003, Plaintiff filed a charge against Xpedx with the Equal Employment Opportunity Commission ("EEOC") for discrimination based on age and retaliation (Dkt. 2, at 28). The EEOC issued a Notice of Right to Sue on August 10, 2005. (Id. at 26-27) On November 10, 2005, Plaintiff brought suit in the Circuit Court for Hillsborough County, Florida, and Defendant filed notice of removal to this court on November 30, 2005. (Id. at 2; Dkt. 1)

## II.     The Parties' Motions to Strike

As a preliminary matter, the court will address Plaintiff's motion to strike (Dkt. 49) and Defendant's motion to strike unauthenticated exhibits (Dkt. 50).

1.     Plaintiff's Motion to Strike (Dkt. 49)

First, Plaintiff moves to strike paragraph 3 of Mark Wilson's ("Wilson") affidavit and paragraph 7 of the Watkoske affidavit on the grounds that the statements contradict prior filings by Defendant, and thus appear to be filed solely for the purpose of delaying the proceeding. Paragraph 3 of the Wilson affidavit provides:

> About a year later in December 2002, I was involved in the termination of Joseph Wells. Dan Watkoske and Jack Luker advised me that Mr. Wells' position was being eliminated. While we inadvertently utilized the same group reduction in force paperwork that was used in the previous reduction in force, Mr. Wells' position was the only position eliminated in the National Accounts Retail Segment at that time.

(Wilson Aff. ¶ 2) Paragraph 7 of the Watkoske affidavit provides:

> I met with Mr. Wells on December 6, 2002, at xpedx's Tampa, Florida office. During this meeting I told Mr. Wells that his position was being eliminated effective immediately. I gave Mr. Wells a termination agreement, which included an offer of severance in exchange for a release of claims, and advised him to review it with an attorney. Mr. Wells' termination was the only termination due to restructuring of xpedx National Accounts Retail Segment between January 1, 2001 and July 1, 2003.

(Watkoske Aff. ¶ 3) Plaintiff argues that while Defendant relies on these affidavits to support its

argument that Plaintiff was not terminated as part of a group or class RIF, Defendant already conceded through its employment and labor counsel in the EEOC investigation that Plaintiff was part of a RIF involving some 3,000 employees company-wide (Dkt. 49, at 1-2). Plaintiff further argues that Defendant has at all times up until the filing of the affidavits claimed that Plaintiff was the subject of a RIF and that Defendant raises the claim that Plaintiff was not part of a RIF for the first time in its motion for summary judgment. (Id. at 2) Thus, Plaintiff argues, the affidavits appear to be filed in bad faith since they run counter to the prior filings of Defendant. (Id.)

In response, Defendant claims that neither of the affidavits' statements directly contradict documents cited by Plaintiff. Defendant further argues that Plaintiff attempts to establish conflicting testimony with unauthenticated documents that contain no sworn statements and which are comprised of statements made by Defendant's labor counsel, not statements made by either affiant (Dkt. 51 at 2, 3).

Pursuant to Federal Rules of Civil Procedure 56(e), an affidavit must be based upon personal knowledge, set forth admissible evidence, and show that the affiant is competent to testify to the matters stated therein. Fed. R. Civ. P. 56(e). "As such, an affidavit must be stricken when it is a conclusory argument, rather than a statement of fact, or when the affidavit is not based on personal knowledge." Pashoian v. GTE Directories, 208 F. Supp. 2d 1293, 1297 (M.D. Fla. 2002) (citation omitted). The general rule is that inadmissible hearsay in an affidavit cannot be considered in summary judgment challenges. Macuba v. DeBoer, 193 F.3d 1316, 1322 (11th Cir. 1999) (citation omitted). However, the court must be careful not to confuse a "sham" affidavit with an unpersuasive one. When statements in a party's affidavit differ or vary from its other evidence before the court, the discrepancies create an issue of credibility, or go to the weight of the evidence, and should be

resolved by the trier of fact. See Tippens v. Celotex Corp., 805 F.2d 949, 954 (11th Cir. 1986) (citation omitted) ("In light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made in an early deposition.")

The paragraphs of the Wilson and Watkoske affidavits which Plaintiff contests meet the requirements set forth in Rule 56(e). Both affidavits provide a sufficient showing that Wilson and Watkoske are competent to testify. Both affiants state that they have personal knowledge of the matters contained in the affidavits, and that they worked for International Paper Corporation and were involved with the termination of Plaintiff during the time period in question. The information contained in these paragraphs is solely factual in nature, and the paragraphs do not contain any inadmissible hearsay. Contrary to Plaintiff's allegations, the record reveals no inherent conflict with prior filings. Furthermore, there is no conflicting prior testimony of these particular witnesses.  Any contention that the statements of these affiants are in direct conflict with contrary evidence in the record goes to the credibility of these witnesses and thus should be presented to the fact-finder at trial. See id. (citations omitted) ("Every discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence.").

Accordingly, Plaintiff's motion to strike paragraph 3 of the Wilson affidavit and paragraph 7 of the Watkoske affidavit (Dkt. 49) is denied.

2.    Defendant's Motion to Strike Unauthenticated Exhibits (Dkt. 50)

Defendant moves to strike documents that Plaintiff filed in support of his response to Defendant's motion for summary judgment. The documents, which consist of 13 exhibits labeled A though M, include letters and documents exchanged between Brenda Thompson, Employment &

7

Labor Counsel for Xpedx, and the EEOC (Dkt. 43, Exs. A-M). Also included are some of Plaintiff's final pay stubs from Xpedx, a letter signed by Watkoske dated December 6, 2002, employee survey results, and a listing of ages and job titles persons in the National Accounts division who were and were not selected for the offer of a Termination Agreement. (Id.) Defendant argues that these documents have not been properly identified or authenticated and thus cannot be considered at the summary judgment stage (Dkt. 50, at 1-2). Plaintiff responds that the documents should not be stricken because they are capable of being authenticated at trial and because they raise a genuine question of material fact as to the waiver issue (Dkt. 56).

Plaintiff is correct in stating that evidence produced by the nonmoving party to avoid summary judgment need not be in admissible form if it could be reducible to admissible form at trial. See United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1444 (11th Cir. 1991) (citations omitted). However, to be considered in support of or in opposition to a motion for summary judgment, a document must be authenticated, either by an affidavit that meets the requirements of Rule 56(e), Fed. R. Civ. P., or in accordance with the Federal Rules of Evidence. Williams v. Eckerd Family Youth Alternative, 908 F. Supp. 908, 911 (M.D. Fla. 1995) (citations omitted). Federal Rule of Evidence 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what the proponent claims." Fed. R. Evid. 901(a).

In connection with the documents at issue, Plaintiff filed an affidavit that purports to identify and testify to his personal knowledge of the pay stubs (Exhibits C, D, E, and F), the letter dated December 6, 2002 (Exhibit G), and the job description  (Exhibit M). The affidavit provided by Plaintiff does not satisfy the technical requirements of an affidavit since it lacks the seal and

commission of the notary (his attorney), nor is it a sworn declaration which the court may consider in the place of an affidavit on summary judgment.[3] However, because Defendant has not filed any objections to the technical deficiencies in the affidavit, but has raised only the failure to authenticate issue, the court will consider the affidavit in connection with the documents at issue. See Campbell v. Osmond, 917 F. Supp. 1574, 1580 n.3 (M.D. Fla. 1996) (citations omitted). Because the affidavit otherwise meets the requirements of Rule 56(e), Fed. R. Civ. P., the court finds that the affidavit is sufficient to authenticate Exhibits C, D, E, F, G, and M. In addition, the court finds that Exhibit J is one of the same documents that Defendant provides in support of its motion and is therefore authenticated. See APA Excelsior III, L.P. v. Windley, 329 F. Supp. 2d 1328, 1335 (N.D. Ga. 2004) (citation omitted) (courts may look to other evidence in the case to determine whether a challenged document meets the standard of Rule 901, Federal Rules of Evidence).

As to the remaining documents that Plaintiff's affidavit does not attest to, these documents must be authenticated under Federal Rule of Evidence 901 in order to be considered by the court in support of Plaintiff's opposition to the motion for summary judgment. The remaining documents consist of copies of letters between International Paper and the EEOC, a copy of the Global Employee Survey Results dated November 1, 2001, a listing of ages and job titles persons in the National Accounts division who were and were not selected for the offer of a Termination Agreement, and an exhibit listing the decisional unit as National Accounts Retail segment. Plaintiff argues that the only person who could have substantiated the existence of most of these documents,

---

[3] On summary judgment, a court may consider a declaration sworn under penalty of perjury and executed in accordance with 28 U.S.C. § 1746 as an affidavit. See Four Parcels of Real Prop., 941 F.2d at 1444 n.36 (citations omitted). However, Plaintiff's purported declaration here does not meet the requirements to be considered as an affidavit under this statute.

besides defense counsel, would have been a representative of the EEOC in Tampa, Florida, whose office received the letters (Dkt. 56, at 2). Plaintiff further contends that such a deposition was not permitted on the limited discovery ordered by the court. (Id.)

Although Plaintiff is correct that the court limited discovery during this phase of the case, depositions are not the only method of authenticating documents. The court has reviewed all of the remaining challenged documents, and concludes that Plaintiff has not sufficiently identified and connected them to the circumstances of this case as required in order to be considered on a motion for summary judgment. See Windley, 329 F. Supp. 2d at 1335-36 (documents were sufficiently identified and connected to the circumstances of the case to provide a basis for being considered in connection with the pending motion for summary judgment where Plaintiff contended that the documents were produced in response to a subpoena and Defendant's general counsel stipulated that the documents were accurate copies responsive to the subpoena).

Accordingly, Defendant's motion to strike unauthenticated exhibits (Dkt. 50) is granted in part as to Exhibits A, B, H, I, K, and L of docket number 43. Defendant's motion is denied in part as to Exhibits C, D, E, F, G, J, and M of docket number 43 and the court will consider these documents in conjunction with Plaintiff's response to the motion for summary judgment.

## III.    Summary Judgment Standard

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that there is no issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the movant has met this

burden, the nonmoving party must identify specific facts that raise a genuine issue for trial. Id.; Fed. R. Civ. P. 56(e).

"A factual dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is 'material' if it might affect the outcome of the suit under the governing substantive law." Beck v. Somerset Techs., Inc., 882 F.2d 993, 996 (5th Cir. 1989) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); accord Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992)). In considering a motion for summary judgment, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Seroka v. Am. Airlines, Inc., 834 F. Supp. 374, 376 (S.D. Ala. 1993) (citations omitted). The court must judge all evidence in the light most favorable to the nonmoving party, and all justifiable inferences must be drawn in the nonmoving party's favor. Fernandez v. Bankers Nat'l Life Ins. Co., 906 F.2d 559, 564 (11th Cir. 1990) (citations omitted). However, the evidence must also be viewed within the scope of the evidentiary burden of the respective parties under the substantive law of the case. Id. (citing Anderson, 477 U.S. at 248). If, under this standard, the evidence can be considered such that a reasonable jury could find for the nonmoving party, summary judgment is inappropriate. Id. (citing Celotex, 477 U.S. at 324).

## IV.     Discussion

The Older Workers Benefit Protection Act ("OWBPA"), 29 U.S.C. § 626(f), governs the waiver and release of age discrimination claims between employers and employees. The burden is on the party asserting the validity of the waiver of rights to demonstrate that the waiver was "knowing and voluntary." See 29 U.S.C. § 626(f)(3). Thus, Defendant "must demonstrate that there

11

is no genuine issue of material fact as to whether the release[] complied with each of the section

626(f) requirements and as to whether the releases were otherwise knowing and voluntary" in order

to prevail on its motion for summary judgment. <u>Thiessen v. Gen. Elec. Capital Corp.</u>, 232 F. Supp.

2d 1230, 1233-34 (D. Kan. 2002) (citations omitted).

An employee's waiver of potential age discrimination claims is valid only if the employee

does so knowingly and voluntarily. <u>Burlison v. McDonald's Corp.</u>, 455 F.3d 1242, 1245 (11th Cir.

2006) (citations omitted). To be knowing and voluntary under the OWBPA, waivers of ADEA

claims must, at a minimum, meet the statutory requirements set forth in 29 U.S.C. § 626(f). <u>See</u> <u>id.</u>

The statutory requirements are:

> (1) the release must be written in a manner calculated to be understood by the employee signing the release, or by the average individual eligible to participate;
> (2) the release must specifically refer to claims arising under the ADEA;
> (3) the release must not purport to encompass claims that may arise after the date of execution;
> (4) the employer must provide consideration for the waiver or release of ADEA claims above and beyond that to which the employee would otherwise already be entitled;
> (5) the employee must be advised in writing to consult with an attorney prior to executing the agreement;
> (6) the employee must be given at least 21 days within which to consider the agreement or 45 days to consider signing if the waiver is offered in connection with an "exit incentive or other employment termination";
> (7) the release must allow the employee to revoke the agreement up to 7 days after signing; and
> (8) if the release is offered in connection with an exit incentive or group termination program, the employer must provide information relating to the job titles and ages of those eligible for the program, and the corresponding information relating to employees in the same job titles who were not eligible or not selected for the program.

<u>Thiessen</u>, 232 F. Supp. 2d at 1234-35; <u>see</u> 29 U.S.C. § 626(f)(1)(A)-(H).

In addition to the statutory factors, the Eleventh Circuit has adopted the "totality of the

circumstances" test, which requires the court to consider non-statutory circumstances and factors

that may be relevant to whether an employee waived his or her rights knowingly and voluntarily. See Griffin v. Kraft Gen. Foods, Inc., 62 F.3d 368, 373-74 (11th Cir. 1995). Examples of additional, non-statutory factors that may be considered under the "totality of the circumstances" test are whether the employee was subject to fraud, duress, coercion, or mistake of material fact, the employee's education and business experience, the clarity of the agreement, and the employee's access to counsel. See Griffin, 62 F.3d at 373-74; Gormin v. Brown-Forman Corp., 963 F.2d 323, 327 (11th Cir. 1992).

Whether Defendant has established six out of the eight statutory factors is not in dispute (Dkt. 48, at 7). Plaintiff does not dispute that the release specifically referred to claims arising under the ADEA, that the release did not purport to encompass claims arising after the date of the agreement's execution, and that Defendant provided additional consideration to Plaintiff in exchange for the waiver. In addition, Plaintiff does not dispute that he was advised in writing to consult with an attorney, that he had 45 days to consider signing the agreement, and that he was allowed seven (7) days to revoke the agreement after signing. At issue are the two remaining statutory factors: the first requirement that the agreement be written in a manner that can be understood by the employee signing the release, and the eighth requirement pertaining to group or class incentives. (Id.) Specifically, the motion for summary judgment turns on the issue of whether the release and severance package provided to Plaintiff was part of an exit incentive or group termination program.

### A.    Whether Plaintiff's Termination Was Part of a Larger Reduction in Force

Defendant argues that "while Plaintiff was given primarily the same package that employees were given in a previous reduction in force, Plaintiff's termination was not part of a larger reduction in force" (Dkt. 36, at 11). Defendant states that although a larger RIF did occur at Xpedx several

13

months prior to Plaintiff's termination, Plaintiff's termination was unrelated to the RIF. (Id.) Relying on the Watkoske and Wilson affidavits, Defendant contends that the decision to eliminate Plaintiff's position was a "reduction in force" based on Plaintiff's failure to adequately perform his job, but that Plaintiff's termination was completely unrelated to the prior, larger RIF (Id. at 11-12; Dkt. 60, at 5-6).

However, the terms of the release agreement itself, as well as the exhibits which Plaintiff provides in support of his response raise a genuine question as to whether Plaintiff was terminated on an individual basis or as part of a larger RIF. First, Defendant's own exhibits raise questions as to whether Plaintiff's position was part of a larger RIF. Both the termination letter from Watkoske to Plaintiff, dated December 6, 2002, and the termination agreement state that Plaintiff had 45 days in which to review and consider the agreement before executing it (Dkt. 37, Attachs. 5, 6). Specifically, the terms of the termination agreement state that "federal law provides that Employee may have forty-five (45) days from receipt of the Agreement to review and consider this Agreement before executing it. . . . Exhibit D to this Agreement contains additional information required to be provided by the company." (Dkt. 37, Attach. 6, at 4). "Exhibit D" consists of a one-page document which lists "[a]ll individuals in the National Accounts Retail segment whose jobs are being eliminated as a result of restructuring" and states that the "decisional unit" is the National Accounts Retail segment (Dkt. 37, Attach. 5, at 23).

Under the statutory framework of 29 U.S.C. § 626(f)(1)(F), an employer is required to allow an employee 21 days to consider a termination agreement if the employee is being terminated on an individual basis and not as part of a group termination program. The 45-day period is required only where the employee is terminated in connection with a group or class RIF. Additionally, section

14

626(f)(1)(H) states that if an employee is terminated as part of a group termination program, as opposed to on an individual basis, then the employer is required to provide the employee with certain information as to the eligibility factors for the program, the job titles and ages of individuals eligible or selected for the program, and the ages of all individuals in the same organizational unit who are not eligible or selected for the program. 29 U.S.C. § 626(f)(1)(H)(i)-(ii).

According to the EEOC, "the scope of the terms 'class,' 'unit,' 'group,' 'job classification,' and 'organizational unit,' is determined by examining the 'decisional unit' at issue." 29 C.F.R. § 1625.22(f)(1)(iii)(C). See also Burlison, 455 F.3d at 1246. A "decisional unit" is defined as "that portion of the employer's organizational structure from which the employer chose the persons who would be offered consideration for the signing of a waiver and those who would not be offered consideration for the signing of a waiver. "The term 'decisional unit' has been developed to reflect the process by which an employer chose certain employees for a program and ruled out others from that program." 29 C.F.R. § 1625.22(f)(3)(i)(B).

Upon Plaintiff's termination, Defendant provided Plaintiff not only with the termination agreement but with "Exhibit D," which lists the "National Accounts Director of Sales-Retail" position as the only position in the decisional unit. Without addressing at this juncture the issue of whether Defendant identified the correct decisional unit in providing this information to Plaintiff, Defendant's attachment of "Exhibit D" to the termination paperwork, which purports to identify a decisional unit, as well as the fact that Defendant allowed 45 days for Plaintiff to review the agreement, could give rise to an inference that Plaintiff's termination was part of a group or class termination program. Moreover, a letter provided by Defendant dated December 6, 2002, signed by Watkoske, states that:

> International Paper Corporation is currently engaged in major restructuring efforts. These efforts are affecting employees in many parts of our company. This letter is to introduce Joseph Wells to you and to let you know that he is seeking alternate employment opportunites because the company's efforts have impacted his position.

(Dkt. 37, Attach. 5, at 3). The court finds that the statements in this letter could support the inference that Plaintiff's termination was part of a group or class termination program.

Furthermore, additional documents provided by Plaintiff in support of his response to Defendant's motion support the inference that Plaintiff was terminated as part of a larger RIF. Exhibits C, D, E, and F of Plaintiff's documents are pay stubs dated April 7, 2003, February 24, 2003, February 7, 2003, and February 6, 2003, respectively (Dkt. 43). All four of these pay stubs contain the phrase "xpedx–RIF" in at least one, and sometimes two, locations on the pay stubs. (See id.)

Because Defendant's motion and supporting affidavits contradict its own evidence before the court regarding whether Plaintiff was part of a larger RIF, the court cannot find that Defendant has met its burden of proving no genuine issue of material fact exists as to whether the release met each of the statutory requirements. Additionally, Plaintiff's evidence could support an inference that Plaintiff was part of a larger RIF. Considering all of the evidence before the court, a reasonable jury could find that Plaintiff's termination was part of a group or class RIF. While Defendant's assertion that it "inadvertently utilized the same group reduction in force paperwork that was used in the previous reduction in force" may be true, it is not for the court to weigh the credibility of the evidence at the summary judgment stage.

**B.      Whether Defendant Fulfilled the Statutory Requirement Regarding Disclosure**

In the alternative, Defendant argues that even if Plaintiff was part of a larger RIF, Defendant fulfilled each of the statutory factors because it provided Plaintiff with the required information

regarding his decisional unit in "Exhibit D," discussed above (Dkt. 36, at 13). While Plaintiff contends that his decisional unit consisted of the "National Accounts" group, (Dkt. 48, at 14-16), Defendant maintains that the appropriate decisional unit for Plaintiff was "National Accounts–Retail" segment (Dkt. 60, at 8). Defendant contends that Plaintiff was the only employee in his decisional unit because Plaintiff was the only employee in his level of management, there were no other comparable positions in the group, and Plaintiff was the only individual terminated in his group (Dkt. 36, at 15). Defendant maintains, therefore, that pursuant to the definition of "decisional unit," the only employee information Xpedx was required to provide to Plaintiff was Plaintiff's own information (Dkt. 60, at 8).

In Burlison, the Eleventh Circuit held that "the OWBPA's informational requirements are limited to the decisional unit that applies to the discharged employees." 455 F.3d at 1247. The EEOC regulations provide some guidance as to what constitutes a decisional unit; they state that the employer's determination of the appropriate class, unit, group, job classification, or organizational unit must be made on a case-by-case basis. See 29 C.F.R. § 1625.22(f)(3)(ii)(A). The regulations provide examples of typical structures for involuntary RIFs, including "facility-wide," "division-wide," "department-wide," "reporting," and "job category." Id. at § 1625.22(f)(3)(iii). In discussing the presentation of information regarding the decisional unit, the regulations notably state:

> If the terminees are selected from a subset of a decisional unit, the employer must still disclose information for the entire population of the decisional unit. For example, if the employer decides that a 10% RIF in the Accounting Department will come from the accountants whose performance is in the bottom one-third of the Division, the employer must still disclose information for all employees in the Accounting Department, even those who are higher rated.
>
> An involuntary termination program in a decisional unit may take place in successive increments over a period of time. . . . Specifically, information supplied with regard to the involuntary termination program should be cumulative, so that later terminees

are provided ages and job titles or job categories, as appropriate, for all persons in the decisional unit at the beginning of the program and all persons terminated to date.

Id. at § 1625.22(f)(4)(v)-(vi).

In Burlison, McDonald's restructured its U.S. divisions from five to three, its regions from 38 to 21, and reduced its workforce by approximately 500 employees nationwide. 455 F.3d at 1244. The Nashville and Greenville regions merged with the Atlanta region to create a new Atlanta-based region. Id. The regional manager of the former Atlanta region worked with senior managers to discharge 66 of the 208 employees in those three regions. Id. The plaintiffs, discharged employees, argued that the appropriate decisional unit was nation-wide, as opposed to regional or locality-based. Id. at 1248. In finding that the 208 employees from the Nashville, Greenville, and Atlanta regions constituted the appropriate decisional unit, the court determined that the appropriate scope of the decisional unit was locality-based, as opposed to nation-wide, because local managers controlled the termination decisions. Id. In essence, the court stated that comparing the localities' workforce to the nation-wide pre-termination workforce would inherently contain statistical bias because it was akin to comparing entirely different corporations. Id.

The court finds Burlison, as well as the above regulations, instructive as to the issue of whether Defendant provided Plaintiff with the appropriate information regarding his decisional unit assuming his termination was part of a larger RIF. Because there is a dispute as to whether Plaintiff was in fact a part of a larger RIF, the record presently before the court does not clearly indicate the appropriate scope of Plaintiff's decisional unit.

Again, the evidence Defendant presents in support of its argument raises genuine issues of fact as to Plaintiff's appropriate decisional unit. Although Defendant repeatedly argues and its supporting affidavits state that the appropriate decisional unit was only the "National

18

Accounts–Retail" segment, of which Plaintiff was the only member at the time of his termination, a contrary inference could be made from the record that the National Accounts division was the appropriate decisional unit. First, it is clear that Plaintiff reported to Watkoske, the Vice President of National Accounts. (Watkoske Aff. ¶ 2; Wells Dep. 31:24-32:9) While Watkoske was based out of Ohio, the record is clear that Plaintiff's job was housed at the "National Accounts–Tampa, FL" facility. (Watkoske Aff. ¶ 2; Dkt. 37, Attach. 5) Based on the holding in Burlison, Watkoske's control over the elimination of a Tampa-based position and the termination of a Tampa-based employee could raise the inference that the decisional unit was larger than the "National Accounts-Retail" segment.

Moreover, Exhibit M of Plaintiff's evidence, which is a Job Description for the position of "Director of Sales, National Retail" dated May 1, 2002, lists the organization/unit for the position as Xpedx, the sector/group as Distribution Business Sector, the location as Tampa, FL, and the department as National Accounts (Dkt. 43, Exh. M). Based on this evidence, "National Accouts-Retail" could be viewed as a subset of a decisional unit.

Assuming Plaintiff was part of a group or class RIF, Defendant has presented no evidence that clearly establishes that the appropriate decisional unit was only "National Accounts–Retail." Moreover, the regulations make clear that if the appropriate decisional unit should have been National Accounts, or if "National Accounts-Retail" was a subset of some other decisional unit, the information supplied to Plaintiff should have been cumulative to the beginning of the termination program. 29 C.F.R. § 1625.22(f)(4)(vi).[4]

---

[4] Because the regulations clearly state that an involuntary termination program in a decisional unit may take place in successive increments over a period of time and that special rules apply in this situation, 29 C.F.R. § 1625.22(f)(4)(vi), the court is not persuaded at this stage by Defendant's

Because the court is denying the motion for summary judgment on the grounds that there is a genuine issue of material fact as to whether Plaintiff was part of an exit incentive or group termination program, the court declines to address Plaintiff's argument that the release was not written in a manner that could be understood.

**V.     Conclusion**

When considering the motion, the record, and the evidence before the court in the light most favorable to the non-moving party, the court finds that genuine issues of material fact exist as to whether Plaintiff's termination was part of a larger RIF. Notwithstanding, and assuming that Plaintiff's termination was part of a larger RIF, the court finds that genuine issues of material fact exist as to whether Defendant provided Plaintiff with the correct information regarding his decisional unit as required under the statute. These factual disputes preclude summary judgment for Defendant.

Accordingly, it is **ORDERED** and **ADJUDGED**:

(1)     Defendant **Xpedx's Motion for Summary Judgment** (Dkt. 36) is **DENIED**.

(2)     Plaintiff's **Motion to Strike** (Dkt. 49) is **DENIED**; and

(3)     Defendant's **Motion to Strike Unauthenticated Exhibits** (Dkt. 50) is **GRANTED IN PART** as to Exhibits A, B, H, I, K, and L of docket number 43 and **DENIED IN PART** as to Exhibits C, D, E, F, G, J, and M of docket number 43.

**DONE** and **ORDERED** in Tampa, Florida this 31st day of October, 2006.

---

argument that the length of time that had elapsed between the larger RIF and Plaintiff's termination precluded Defendant from having to provide Plaintiff with a listing of individuals in a National Accounts Decisional Unit. (See Dkt. 60, at 5-6)

ELIZABETH A JENKINS
United States Magistrate Judge